# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Janelle Follett,                                    Civil No. 09-3167 (MJD / SRN)

        Plaintiff,

                                                 <u>REPORT AND RECOMMENDATION</u>

    v.

Michael J. Astrue,
Commissioner of Social Security,

        Defendant.

_____

    Lionel H. Peabody, P.O. Box 10, Duluth, MN 55801-0010, for Plaintiff.

    Lonnie F. Bryan, Asst. United States Attorney, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN 55415; Donna L. Calvert, Office of the Regional Chief Counsel, Social Security Administration, and Deepa Rajkarne, Asst. Regional Counsel, Social Security Administration (Of Counsel), for Commissioner.

_____

SUSAN RICHARD NELSON, United States Magistrate Judge

    This matter comes before the undersigned United States Magistrate Judge on the parties' cross motions for summary judgment (Doc. Nos. 11, 22). Pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), Plaintiff Janelle Follett ("Plaintiff" or "Claimant") seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner ruled that Plaintiff was not entitled to a period of disability, and therefore not entitled to disability insurance benefits (DIB) or supplemental security income (SSI) under the Social Security Act.

    This matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and District of Minnesota Local Rule 72.1(b). For the reasons stated below, the Court recommends granting in part and denying in part the Plaintiff's motion for summary judgment, denying the Commissioner's motion for summary judgment, and remanding the action to the Social Security Administration.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Procedural History

In February 2006, Plaintiff filed an application for DIB and SSI under the Social Security Act, 42 U.S.C. §§ 416, 423 & 1382c.  She claimed that she had become disabled on April 30, 2004, due to anxiety, depressive disorder, post traumatic stress disorder (PTSD), gall bladder problems, a learning disability, and a knee injury.  (Admin. R. at 13, 19, 97-99 & 100-02.)

Her applications were denied, both initially and upon reconsideration.  She received a hearing before an Administrative Law Judge ("ALJ") on September 23, 2008.  On January 28, 2009, the ALJ found that she was not disabled because her impairments did not preclude her from performing a significant number of jobs in the national economy during her period of alleged disability.  (Id. at 13-25.)  Accordingly, she was not entitled to benefits under Titles II and XVI of the Social Security Act.

On September 29, 2009, the Appeals Council denied her request for review.  (Id. at 10-12.)  Accordingly, the ALJ's decision became the Commissioner's final decision.  20 C.F.R. §§ 404.981, 416.1481.  This Court therefore has jurisdiction to review that final decision.  42 U.S.C. §§ 405(g), 1383(c)(3).

Plaintiff now seeks reversal of the ALJ's decision and an award of benefits, or alternatively, a remand for a new hearing.  (Doc. No. 12, at 35.)

### B.    Statement of Facts

Plaintiff alleges she became disabled when she was 31 years old in April 2004.  (Admin. R. at 24.)  She was 35 years old when the ALJ issued his decision in January 2009.  Plaintiff did not graduate from high school, where she was in special education classes, and also lacks a GED.  She lacks a driver's license despite having taken the test some fourteen times since she

was fifteen years old, due to her inability to "read or comprehend the book to pass the test." (Admin. R. at 33.)  She attempted suicide once as a teenager.  She is presently the divorced mother of a teenage son, of whom she has custody.  (Id. at 29.)

Perhaps the best summary of Claimant's childhood history is provided by the initial February 6, 2006 Psychological Evaluation conducted by Mark Ham, Ph.D., L.P.:

- both parents were "chronic alcoholics" and she may have been exposed to alcohol in utero;

- she had a "traumatic childhood, include abuse";

- she was "identified as requiring special educational services in preschool" and received them "throughout her scholastic career";

- she has always "had particular problems with reading comprehension"; and

- she "was exposed to alcohol at a very early age," likely "when she was two or three years old."

(Id. at 304-05.)

###    C.    The ALJ's Decision and Findings

The ALJ issued a thirteen-page decision, following the five-step sequential analysis outlined by the Secretary of Health and Human Services.[1]  The ALJ first found that Plaintiff "has not engaged in substantial gainful activity since April 30, 2004, the alleged onset date."  (Admin. R. at 15.)  With respect to the second step, the ALJ found that Claimant "has the following severe impairments:  obesity, MCL sprain of the right knee, status post arthroscopy of the right knee, asthma, organic mental disorder, affective disorder, anxiety-related disorder, and substance

---

[1]    The analysis essentially asks (1) whether the claimant is presently engaged in substantial gainful activity, (2) whether he has a severe impairment, (3) whether he has a presumptively disabling impairment as listed in the regulations, (4) whether he has the residual functional capacity to perform his past work, and (5) if he cannot perform such work, whether there are other jobs in the national economy that he can perform.  E.g. Kelley v. Callahan, 133 F.3d 583, 587-88 (8th Cir. 1998).

addiction disorder." (Id.) After discussing her physical impairments, the ALJ noted that she has "a history of significant post traumatic stress disorder (PTSD) systems [sic], including intrusive memories and flashbacks relating to sexual abuse during her childhood." (Id. at 16.) As he explained:

> She reports a history of episodic depression since her childhood, characterized by decreased energy, anhedonia, sadness, low self esteem, inability to cope and a tendency to withdraw and avoid others when she is severely depressed. The record contains diagnoses of major depressive disorder, recurrent, and PTSD.

(Id.) The ALJ further noted that she has "obtained a full scale IQ score of 78, reflecting borderline to low average intellectual functioning. The claimant [received] WIAT-II . . . scores of 51 in word reading and 56 in reading comprehension, consistent with a learning disability in reading." (Id.)

Accordingly, the ALJ concluded that she "meets the diagnostic criteria for organic mental disorder . . ., an affective disorder . . ., an anxiety-related disorder . . . ., and a substance addiction disorder . . . under the Listing of Impairments." (Id.) Furthermore, "these conditions are medically established and would more than minimally affect the claimant's ability to work. There are no other severe impairments documented in the record." (Id.)

Turning to the third step, the ALJ addressed whether any of these severe impairments constituted a listed impairment so as to render Plaintiff presumptively disabled under the Act. The ALJ found that she "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments." (Id.) The ALJ first explained that she "is not subject to any physical impairment, or combination of physical impairments, that meets or medically equals the relevant criteria of any listed impairment." (Id. at 17.)[2]

_____

[2]    Although Plaintiff has physical impairments and illnesses, the present appeal appears to focus entirely on her mental and emotional impairments. (Doc. No. 12, at 2 n.2

Turning to her mental impairments, the ALJ found that they, "considered singly and in combination, do not meet or medically equal the criteria of listings," in part because the impairments did not result in at least two of the "paragraph B" criteria, that is, "marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration." (Id.)

The ALJ found that she has only "mild restrictions" in terms of "activities of daily living" as she

> engages in a variety of daily activities. She states she does household chores, mows the lawn, goes shopping, washes the dishes, does the laundry, works on latch hook rugs and embroidery, watches television, and prepares complete meals for herself and her son on a daily basis. . . . She states she enjoys fishing and spending time with her son. The claimant reports no problems taking care of her personal needs.

(Id.) With respect to social functioning, the ALJ found that she has "moderate difficulties":

> The claimant alleges mood swings, irritability, increased social isolation, and difficulty getting along with others. She states she is very sensitive and cries easily if she is criticized. [Claimant's case manager] notes that the claimant exhibits increased anxiety and depression in public places or in large crowds of people.

(Id.)

The ALJ noted that Claimant's Global Assessment of Functioning scores of 45 and 50

_____

(noting that her "physical impairments will be referred to only to the extent they are relevant to her mental impairments"); Doc. No. 23, at 3 n.2 ("Because Plaintiff's brief focuses solely on her alleged mental impairments, the Commissioner's summary of the relevant medical evidence pertains only to same.").) The Court notes, however, that "the ALJ was obligated to consider the combined effects of [Claimant's] numerous physical impairments as well as her mental impairments." Cunningham v. Apfel, 222 F.3d 496, 501 (8th Cir. 2000) (emphasis added) (stating that where a claimant asserts multiple impairments, the Commissioner is required "to consider the combined effect of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient medical severity to be disabling").

indicated "'serious symptoms (e.g., suicidal ideation, severe obsessional ritual, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job),'" but did not give those assessments "significant weight because the GAF score as used in the DSM-IV was intended to be used for diagnostic purposes and not for making determinations related to disability." (Id.) The ALJ also stated that such assessments only measure a person's functioning at a particular point in time, not over an extended period, noting that Claimant's score of "52 in April 2008" reflected only "moderate symptoms" or "moderate difficulty in social, occupational, school functioning." (Id.) In sum, the ALJ found that

> the overall evidence of record reflects moderate limitations in social functioning. Inconsistent with any significant social isolation, the claimant indicates that she talks on the phone daily, goes outside every day, goes shopping for groceries and household supplies, attends her doctor appointments and counseling sessions, and sees her job force workers. She states she enjoys fishing and has two very good friends who she sees often. She states she has no problems getting along with authority figures.

(Id. at 17-18.)

Furthermore, the ALJ found only "moderate difficulties" in terms of concentration, persistence or pace. The ALJ noted that Claimant "reports memory and concentration problems, difficulty completing tasks, difficulty comprehending what she reads, problems filling out paperwork, and problems understanding and following instructions." (Id. at 18.) The ALJ further stated that Claimant "testified that someone has to read her mail to her" and that she stated that "she has been let go from jobs in the past because she was unable to understand the instructions," that "she needs reminders to take her medications," and that she has a case manager who helps her with her completing paperwork." (Id.) Nevertheless, the ALJ found that her "limitations in this area" do not "rise to the level of marked" because "[m]ental status

examinations have generally found the claimant alert and oriented. The claimant states she is able to uses [sic] public transportation, count changes [sic], and handle a savings account, which would not be possible if she were subject to marked limitations in concentration, persistence and pace." (Id.) Therefore, and because Claimant experienced no extended episodes of decompensation, she failed to meet the "paragraph B" criteria. The ALJ also found she failed to satisfy the "paragraph C" criteria.

Accordingly, the ALJ turned to determining the claimant's residual functional capacity. (Id.) He found she has the

> residual functional capacity to perform light work as defined in 20 CFR 414.1567(b) and 416.967(b)m requiring lifting twenty pounds occasionally and ten pounds frequently, standing/walking six hours in an eight-hour day and sitting six hours in an eight-hour day, with occasional climbing of ramps and stairs, no climbing of ladders, ropes or scaffolds, no more than frequently balancing, occasional stooping, crouching and crawling, no kneeling, and no concentrated exposure to fumes, dust, gas and odors. The claimant is limited to low stress, routine, repetitive work, no detailed or complicated tasks, brief, infrequent, and superficial contact with coworkers and no significant limitations in the ability to handle supervision as long as the work is limited to routine, repetitive low stress work.

(Id. at 18-19.)

The ALJ explained that he considered opinion evidence in accordance with the requirements of various regulations, Social Security Rulings and Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984). (Id. at 19.) Noting the two-step process he was obligated to follow–first to determine any impairments that could reasonably be expected to produce her symptoms, and second, to determine the extent to which they limit her ability to do basic work activities–the ALJ explained that "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," he must "make a finding on the credibility of the statements based on a consideration of the

entire case record." (Id. at 19.)

Although he found the observations of Claimant's case manager "sincere, well-intentioned, and essentially consistent with the claimant's asset pain and limitations," the ALJ refused to reduce the RFC further (beyond what he had earlier determined) based on those observations. The ALJ explained that he found the claimant credible regarding her pain and functional limitations and had already reduced her RFC to accommodate those limitations. (Id. at 19-20 (explaining physical limitations).) The ALJ further noted that he had reduced the RFC "to incorporate limitations from the mental impairment," but explained that he could not "conclude that the claimant is incapable of all work activity at any exertional level because of significant inconsistencies in the record as a whole." (Id. at 20.)

The ALJ explained that while he found "that the claimant does have severe impairments and has considered the subjective allegations, in determining the specific degree of physical and mental restrictions" of the RFC, he gave the "greatest weight to the conclusions of the Disability Determination Services (DDS) medical and psychological consultants. . . . Medical evidence submitted after their evaluation does not support any ongoing worsening in symptoms." (Id.)

After first finding that the overall evidence of record did not support her allegations of disabling levels of knee pain and that her history of asthma did warrant additional reductions in the RFC, he found that her "mental health symptoms are inconsistent with a finding of disability for any twelve month period of time." (Id. at 20-21.) The ALJ noted the various instances of Claimant's feelings and behavior that he considered "inconsistent" with such disability:

- that in November and December of 2005, she had an "improved mood" and felt "less overwhelmed"

- that in March 2006 her "mood was brighter" and she was "looking forward to spring"

- that in May 2006 she reported "enjoying fishing with her boyfriend on week-ends"

- that in September 2006 she "appeared less depressed"

- that in December 2006 she "enjoyed taking a twelve day trip" with her ex-husband

- that in the Summer of 2007 she was active "fishing on lake [sic] Superior with friends"

(Id. at 21.)  The ALJ also found "that a good portion of the claimant's symptoms were situational in nature."  (Id.)

The ALJ then explained why he discounted the opinions of several health-care providers. (Id. at 22.)  He did not give "great weight" to the February 2006 opinion of Mark Ham, Ph.D., "because it is vague and conclusory and not supported by the overall evidence of record."  (Id.) The ALJ also did not give "great weight" to the April 2007 letter from the St. Louis County Public Health and Human Services Department because it was "not supported by the overall evidence of record and appears to be based on the claimant's subjective assertions of her limitations."  (Id. (also noting it was "not entitled to weight as a medical opinion").)  The ALJ likewise discounted the February 2008 opinion of Jayme A. Bork, DO, Claimant's psychiatrist, because "his opinion is inconsistent with treatment notes which have found no audio or visual hallucinations and intact insight, judgment and memory."  (Id.)

Similarly, the ALJ noted that while Janet Anderson, MS, LP, opined in March 2008 that Claimant "is unable to work competitively," she also "referred to the claimant's lack of follow through in her medical treatment and her failure to take any responsibility for her own actions." (Id.)  The ALJ likewise discounted the opinion of Susan Cook, MSW, LICSW, that Claimant is "unable to sustain competitive employment due to" various factors such as her "inability to comprehend what she is reading" because her opinion was "not supported by the evidence of

record" as it was "inconsistent with Ms. Cook's opinion that the claimant has good ability in the areas of getting along with coworkers . . . and interacting appropriately with the general public." (Id.) The ALJ also found Ms. Cook's opinion "internally inconsistent" because while Ms. Cook thought "claimant would likely miss more than three days of work a month," she also thought Claimant "has a very good ability to maintain regular attendance." (Id.) The ALJ also noted that the various opinions that Claimant "is unable to work are not entitled to controlling weight since it is a medical opinion on an issue reserved for the Commissioner." (Id. at 23.)

The ALJ further stated that he found "inconsistences in the record which do not support the above medical opinions," noting evidence of Claimant's "medication noncompliance," and found "the claimant's allegations of disability less than credible" because "one of her therapists told her she would no longer work with her because she was not doing enough to make positive changes in her life" and that "the claimant's MFIP benefits may be terminated if she does not attempt to work." (Id.)

Finally, the ALJ found "the above opinions are inconsistent with the overall evidence of record" because "there is no evidence of any inpatient psychiatric hospitalizations" (other than Claimant's overdose as a teenager), "her depression was described as moderate in April 2008 and in August 2008," and she "has been described as alert and oriented and in no acute distress," as well as "consistently" described "as well groomed, neat, and clean which suggest that her depression is not so severe that she has lost interest in her hygiene." (Id.) "Finally, the record reveals that the claimant has responded favorably to psychotherapy and psychotropic medications." (Id.)

With respect to Claimant's work history and receipt of workers compensation benefits, the ALJ noted that "the criteria used in the evaluation of" such benefits "is different than that

used to evaluate social security disability claims." (Id.)  The ALJ further observed that while

Plaintiff claimed a disability date of April 2004, she had "no earnings or minimal earnings in

many of the years prior to that date." (Id.)  Accordingly, he found that Claimant's "work history

does not evidence a significant motivation to return to employment."  (Id.)

After finding that Claimant "is unable to perform her past relevant work," that she "has a

limited education," and that "transferability of job skills is not material," the ALJ concluded that

"there are jobs that exist in significant numbers in the national economy that the claimant can

perform." (Id. at 24.)  The ALJ explained that the vocational expert testified that given all of the

relevant factors, Claimant "would be able to perform the requirements of approximately twenty

to thirty positions in the wrapping and packing occupational field, such as packaging machine

operator, wrapping machine operator, bander and cellophaner." (Id.)  Based on the evidence, he

concluded that she "is capable of making a successful adjustment to other work," and, a "finding

of 'not disabled' is therefore appropriate." (Id. at 25.)

After the Appeals Council denied her request for review, Plaintiff then sought judicial

review of the ALJ's decision in this Court.

## II.  DISCUSSION

### A.  Standard of Review

The findings of the Commissioner are conclusive if they are supported by "substantial

evidence." 42 U.S.C. § 405(g).  This Court's review of the Commissioner's final decision is

deferential as that decision is reviewed "only to ensure that it is supported by 'substantial

evidence in the record as a whole.'"  Hensley v. Barnhart, 352 F.3d 353, 355 (8th Cir. 2003).

This Court's task is confined to reviewing "the record for legal error and to ensure that the

factual findings are supported by substantial evidence." Id.

The applicable "substantial evidence in the record as a whole" standard does not require a preponderance of the evidence, but rather only "enough so that a reasonable mind could find it adequate to support the decision." Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003). But this Court must "consider evidence that detracts from the Commissioner's decision as well as evidence that supports it." Burnside v. Apfel, 223 F.3d 840, 843 (8th Cir. 2000). Thus, a "notable difference exists between 'substantial evidence' and 'substantial evidence on the record as a whole.'" Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989) (internal citation omitted).

> "Substantial evidence" is merely such "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." "Substantial evidence on the record as a whole," however, requires a more scrutinizing analysis. In the review of an administrative decision, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory.

Id. (internal citation omitted).

Nevertheless, this Court cannot reverse "merely because the evidence is capable of supporting the opposite conclusion." Hensley v. Barnhart, 352 F.3d 353, 355 (8th Cir. 2003). Thus, if the record permits one to draw two inconsistent positions and one of those represents the Commissioner's findings, this Court must affirm. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). This Court's task "is not to reweigh the evidence, and [the Court] may not reverse the Commissioner's decision merely because substantial evidence would have supported an opposite conclusion or merely because [the Court] would have decided the case differently." Harwood v. Apfel, 186 F.3d 1039, 1042 (8th Cir. 1999). Because "[t]he ALJ is in the best position to determine the credibility of the testimony," this Court usually defers to the ALJ's decisions on credibility. Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).

In reviewing the ALJ's decision, this Court is "generally guided by the following

factors":  (1) the ALJ's findings regarding credibility; (2) the claimant's education, background, work history and age; (3) the medical evidence provided by the claimant's treating physicians; (4) the claimant's subjective complaints of pain and description of physical activity and impairment; (5) third parties' corroboration of the claimant's physical impairment; (6) vocational experts' testimony based on proper hypothetical questions that fairly set forth the claimant's impairments; and (7) consulting physicians' testimony.  Brand v. Secretary of the Dept. of Health, Education and Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

### B.      Entitlement to Disability Benefits Under the Social Security Act

Plaintiff is entitled to disability benefits if she suffers from a "disability."  The Social Security Act generally defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416(i)(1).

To determine the existence of a disability under the Act, the Administration engages in a "five-step sequential evaluation process" in which a claimant can be found not disabled at any of the five steps: (1) if the claimant is "doing substantial gainful activity," she is not disabled; (2) if the claimant does "not have a severe medically determinable physical or mental impairment" meeting certain durational requirements, she is not disabled; (3) if the claimant has an impairment of a certain specified severity, she is conclusively disabled; (4) but if the claimant has a residual functional capacity such that she can still do his "past relevant work," she is not disabled; and (5) if the claimant "can make an adjustment to other work," based on her residual functional capacity, age, education and work experience, she is not disabled.  20 C.F.R. § 404.1520(a)(4).

Generally, the claimant has the burden to prove that she is disabled. 20 C.F.R. § 404.1512(a). The Administration has clarified the respective burdens of production and of persuasion with respect to each of the five steps. 68 Fed. Reg. 51153 (Aug. 26, 2003) (stating rules are effective September 25, 2003). The claimant bears the "dual burdens of production and persuasion through step 4 of the sequential evaluation process." Id. at 51155. Thus, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

Here, the ALJ found Plaintiff to be not disabled because she possessed a residual functional capacity that permitted her to perform "light work" in certain jobs in the national economy. (Admin. R. at 18, 25.) On appeal to this Court, Plaintiff argues that the ALJ's "decision is not supported by substantial evidence on the record as a whole and is contrary to law" because (1) "the ALJ did not recognize that [Claimant] has a borderline personality disorder"; (2) the vocational expert's testimony does not constitute substantial evidence supporting a denial, because the ALJ did not include all of [Claimant's] severe impairments and limitations in the hypothetical question to the vocational expert, and [that] expert's testimony is inconsistent with the Dictionary of Occupational Titles; (3) the ALJ did not give the opinions of treating sources the weight required by law; (4) the ALJ and the Appeals Council failed to fully and fairly develop the record by having the record reviewed by a psychiatrist or psychologist; and (5) the ALJ's credibility findings cannot be sustained. (Doc. No. 12, at 1-2.) Accordingly, the "record as a whole shows that [Claimant's] combined mental impairments meet the requirements of Social Security Listings, and cause disabling limitations." (Id. at 2.)

The Court approaches these related issues in a somewhat different order.

## C.  The ALJ Erred By Discounting Medical Opinions of Treating Sources

Plaintiff contends that the ALJ "rejected all treating opinions and relied on the opinions of the non-examining state agency reviewers." (Doc. No. 12, at 30.)  She further contends that the state agency reviewers "were missing much of the relevant treatment record and were not aware of the opinions of treating sources." (Id. at 34.)  For example, she notes that "[t]he DDS did not review any evidence subsequent to April 18, 2006," and the reviewer "had none of the hospital records, and the only treating source opinion in the file was from Dr. Ham's psychological evaluation." (Id. at 31.)

An ALJ should generally accord "substantial weight" to a treating physician's opinion. E.g. Ghant v. Bowen, 930 F.2d, 633, 639 (8th Cir. 1991).  Such an opinion "should not ordinarily be disregarded" and "[i]n fact, it should be granted controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000) (citing Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998)); accord Soc. Sec. Ruling 96-2P, 1996 WL 374188 (July 2, 1996).  "By contrast, '[t]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence.'" Cunningham, 222 F.3d at 502 (quoting Kelley, 133 F.3d at 589).  Finally, the Administration "generally give[s] more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(5).

Here, the ALJ discounted the medical opinions of several treating sources—all of whom had diagnosed Claimant as suffering from depression, anxiety, and posttraumatic stress disorder—largely because Claimant was still engaging in certain life activities and even enjoying

some of them. (Admin. R. at 21-23.) But "it is well-settled law that 'a claimant need not prove she is bedridden or completely helpless to be found disabled.'" Reed v. Barnhart, 399 F.3d 917, 923 (8th Cir. 2005) (noting that claimant's "anxiety and panic attacks, difficulty sleeping, loss of concentration, nightmares and flashbacks and discomfort around strangers . . . hardly seems inconsistent with her ability to perform such routine and simple daily living activities 'to any degree'"). In Reed, the Eighth Circuit reversed a denial of benefits sought by a woman who had been "diagnosed with anxiety-related disorder, post-traumatic stress disorder, [and] depression," after having been raped. Id. at 918. She did not have a driver's license, but described herself as capable of taking care of herself and engaging in certain activities, although with limitations and frustration. Id. at 919-20.

The Eighth Circuit "has repeatedly stated that a person's ability to engage in personal activities such as cooking, cleaning, and hobbies does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity." Kelley v. Callahan, 133 F.3d 583, 588-89 (8th Cir. 1998). Thus, there is no necessary inconsistency in a record that discloses both (1) diagnoses of depression, anxiety and PTSD, and (2) a claimant's ability to engage in certain tasks or even to enjoy certain activities.[3]

Moreover, insofar as those abilities are asserted by the Claimant herself, "[w]ith regard to mental disorders, the Commissioner's decision 'must take into account evidence indicating that the claimant's true functional ability may be substantially less than the claimant asserts or

---

[3] The Commissioner relies on Lawrence v. Chater, 107 F.3d 674 (8th Cir. 1997) for the proposition that the ALJ properly found Claimant not disabled by her depression and anxiety based on her ability to engage in daily activities. But in Lawrence, the claimant's impairments were purely physical (a back injury) and the court discounted her testimony regarding the severity of her pain and disability because it was contradicted by the medical evidence and the level of her daily activities. Id. at 676-77.

wishes.'" <u>Hutsell v. Massanari</u>, 259 F.3d 707, 711 (8th Cir. 2001). For example, while Claimant reported that she could use public transportation, St. Louis County officials have stated that she "is unable to figure out the bus schedules and to understand which bus she needs to be on to transfer so she can get where she needs to be." (Admin. R. at 491.) Moreover, they noted that she conceals her disabilities and the means for dealing with them to avoid being ridiculed. (<u>Id.</u>) Similarly, Susan Cook noted that Claimant "appears to have a constant fear of appearing 'dumb,' so she tries to appear as though she knows what she is doing at all times." (<u>Id.</u> at 824.) And on July 13, 2009, Cook stated that Claimant "is able to appear competent in many ways. She is also able to maintain stability for a period of time, but she is actually full of chaos and crisis underneath her exterior." (<u>Id.</u> at 854.)

Not only is there nothing inconsistent with the ability to engage in certain activities while suffering from a mental illness, the nature of mental illness is that the symptoms are not consistent over time. As the Eighth Circuit has explained, it is "mindful" that

> "'[i]t is inherent in psychotic illnesses that period of remission will occur,'" and that such remission does not mean that the disability has ceased. Indeed, "one characteristic of mental illness is the presence of occasional symptom-free periods." Although the mere existence of symptom-free periods may negate a finding of disability when a physical ailment is alleged, symptom-free intervals do not necessarily compel such a finding when a mental disorder is the basis of a claim. Unlike many physical impairments, it is extremely difficult to predict the course of mental illness. Symptom-free intervals and brief remissions are generally of uncertain duration and marked by the impending possibility of relapse.

<u>Andler v. Chater</u>, 100 F.3d 1389, 1393 (8th Cir. 1996) (internal citations omitted) (reversing denial of benefits). Thus, particularly with respect to mental illnesses, an ALJ must avoid "'playing doctor,' a practice forbidden by law." <u>Pate-Fires v. Astrue</u>, 564 F.3d 935, 944 (8th Cir. 2009) (quoting <u>Rohan v. Chater</u>, 98 F.3d 966 (7th Cir. 1996)).

The Commissioner argues that the "ALJ acknowledged that additional evidence was

submitted after [the state agency consultant's] evaluation and he expressed that such [evidence] did not support 'any ongoing worsening of symptoms.'" (Doc. No. 23, at 14-15; accord id. at 16.) And in discounting the opinions of treating providers, the ALJ relied extensively on "Exhibit 4E," a single "Function Report" completed by Claimant's case manager on April 11, 2006. (Admin. R. at 17-18 (citing "Exhibit 4E" multiple times).) The Court notes that the date of this report is roughly coincident with the state agency examiner's June 18, 2006, assessments that the ALJ relied on over the medical opinions of various treating sources.

But the issue is not as simple and linear as the Commissioner contends–that is, it is not simply a question of whether Claimant's condition deteriorated after the June 2006 state agency assessment. Rather, in light of the nature of mental illnesses as recognized by the Eighth Circuit, the issue is whether the ALJ's conclusion can be sustained on the basis of the entire record of Claimant's medical history from April 30, 2004 through January 2009.

Here the record is replete with repeated diagnoses of depression, anxiety, and PTSD from several treating providers dating at least as far back as April 25, 2001, when she was admitted to Miller-Dwan Medical Center for "depression with anxiety" (Admin. R. at 442-43), and continuing (with intermittent periods of remission and of relief from treatment) as late as March 2009 (id. at 823 (March 9, 2009 Diagnostic Assessment Update), 830 (March 10, 2009 office note of Jayme Bork, DO, noting claimant, who had "got off of all her medications" now "wants back on her medications" as she has been "struggling with some nightmares, tearfulness, and depression")). And a diagnosis of Borderline Personality Disorder was added in November 2006. (Admin. R. at 442-43.) These diagnoses do not disclose any inconsistencies with each

other.[4]

Moreover, a review of the entire record reveals that the symptoms of Claimant's various mental illnesses oscillate frequently over time. For example, Jane Anderson's November 2006 Diagnostic Assessment Update noted Claimant's description of "her affect as a rollercoaster." (Admin. R. at 540.) And the March 9, 2009 Progress Note by Susan Cook states that Claimant "reported that her depression has returned and [that] she stopped doing anything for a few months and 'shut people out.'" (Id. at 822.) A review of Cook's various progress notes and diagnostic assessments from April 21, 2008 through April 27, 2009 discloses the often rapid changes in Claimant's condition and affect. (Id. at 802-29.)

---

[4]    Moreover, many of these treating sources opined that Claimant was not capable of employment. (E.g., Admin. R. at 307 ("[Claimant] is unlikely to be able to hold down a full-time job responsibly until her posttraumatic stress disorder symptoms are better under control."), 854 ("She would not be able to stay at a job now.").) The ALJ stated that the opinions that Claimant "is unable to work are not entitled to controlling weight since it is a medical opinion on an issue reserved for the Commissioner." (Id. at 23.) Likewise, the Commissioner argues that such an opinion "pertains to an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." (Doc. No. 23, at 16 (citing Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004)).) But in Kelly v. Callahan, the Eighth Circuit ruled that "[t]he assumption that physicians cannot opine as to the hours a claimant can work is wrong. . . .  In fact, medical opinions on how much work a claimant can do are not only allowed, but encouraged." 133 F.3d 583, 589 (8th Cir. 1998) (citing Smallwood v. Chater, 65 F.3d 87, 89 (8th Cir. 1995)). In Smallwood, the court clarified that a physician may–indeed should–offer a valid opinion on whether a claimant is capable of working in light of their impairments, but not on whether a claimant "could find work or be gainfully employed" as those issues are "outside the medical province." 65 F.3d at 89. And in Stormo, the Eighth Circuit simply pointed out the well-established rule that a treating physician's opinion, including one regarding the claimant's ability to work, is not entitled to controlling weight if "they are inconsistent with the record as a whole or if the conclusions consist of vague, conclusory statements unsupported by medically acceptable data." 377 F.3d at 805-06. Thus, a physician's opinion that a claimant can not work is not *per se* invalid. Rather, it is evaluated as is any other physician's opinion–by whether it is supported by the evidence of record. Here, for example, the Court notes that Mark Ham's February 2006 opinion regarding Claimant's inability to work was a conclusion reached after an extensive psychological evaluation based not only on tests he conducted at that time but on the "voluminous information already available in the chart." (Admin. R. at 303-04.)

Consistent with the inherently variable nature of mental illness, Mark Ham, Ph.D., L.P., diagnosed Claimant in his initial psychological evaluation of her on February 6, 2006–shortly before the state agency review relied upon by the ALJ–as suffering from, among other things, "<u>Recurrent</u> Major Depressive Disorder – <u>in partial remission</u>." (Admin. R. at 306 (emphases added).) He noted that she had "received psychological services at various points since childhood" and that "she has experienced episodic depression since childhood." (<u>Id.</u> at 303, 305.) Claimant stated that her "depressive symptoms were absent "between the ages of 22 and 30," which Dr. Ham noted was "consistent with "<u>recurrent</u> major depression." (<u>Id.</u> at 305 (emphasis added).) He also noted her "depressive symptoms have been remitting over the past month." (<u>Id.</u>)

The fact that Claimant described herself as functioning relatively well on a single day in April 2006 is thus inconsistent with the evidence as a whole. For example, in November 2005, Jane Anderson conducted a Diagnostic Assessment of Claimant, who was "referred by her physician to address her depression." (<u>Id.</u> at 365.) Claimant reported she had been "living under a black cloud for a year and a half," sleeps excessively to avoid stressors, and "hates getting out to do things such as shopping" and thus "primarily stayed in her house." (<u>Id.</u>) Her concentration and memory problems required her to be reminded by others to take her medications. (<u>Id.</u>) She was experiencing flashbacks daily and thus "avoids reminders of past abuse and painful incidences." (She reported that "she was sexually abused by her father, including rape, from the age of six to ten," and that she was "physically abused by her mother and sister." (<u>Id.</u> at 366.)) "She does not let people in her home, as she describes her home as a 'disaster,' not having the energy to clean it." (<u>Id.</u> at 365.)

Moreover, even that single April 2006 self-assessment on which the ALJ relied reveals

that she could not take care of a pet because "it would be too much," that she "used to be able to read and comprehend, to some extent, [but] now [she is] lost," that her illnesses affect her ability to read the mail and other forms, that she needs to be reminded by others to take her medications and do house and yard work, that she has difficulty with instructions and recipes, and that she is unable to pay bills and use a checkbook, requiring a friend to do that for her. (Admin. R. at 165-68.) She also revealed that she does not spend time with others, has problems getting along with others and thus stays home alone more. (Id. at 169.)

She indicated that her illnesses affect her ability to talk and hear, as well as her memory, understanding and ability to complete tasks, concentrate, follow instructions and get along with others. (Id.) She also stated she cannot pay attention for long, does not finish what she starts, cannot follow written instructions and does not follow spoken instructions well. (Id.) She also does not handle changes in routine. (Id. at 170.)

A similar Function Report completed a few months later in October 2006 indicates that Claimant has "always had difficulty [with] reading / comprehension, [and] organization" and that "depression exacerbates her learning disabilities." (Id. at 215.) Her depression also prevents her from sleeping and her illnesses undermine her ability to "understand simple directions, such as recipes, etc." (Id.) She needs to be reminded to take her medications and while she prepares meals they are "only things she [already] knows or is shown how to cook." (Id. at 216.) Her ability to cook "has always been limited" and "depression makes it more difficult to cook." (Id.) She also sometimes will not do her house or yard work or "let [it] go when depressed." (Id.) She stated she goes outside "maybe once a week" due to her anxiety with "large crowds" and "public places." (Id. at 217.) She conducts most of her financial transactions in cash because it is hard for her "to write out checks or [money] orders." (Id.) By this time she was sewing and

watching TV less because she had "no ambition, interest [due to her] depression / apathy."  (Id. at 218.)  She also needs to be reminded to go places and often needs to be accompanied by others.  (Id.)  She also reported "much fewer social activities."  (Id. at 219.)

Claimant also indicated her memory, concentration and understanding were impaired such that she had trouble completing tasks, following instructions and getting along with others. (Id.)  She could not remember things such as "meals," had difficulty with "follow through from start to finish on a task," described her concentration as "scattered, flighty," and stated she "can't read."  With respect to her ability to follow written instructions, she stated she "can't - extremely difficult," and that she follows spoken instructions "not well" and "gets confused" and must have them repeated "several times."  (Id.)

Similarly, the ALJ also noted that he had "considered the Global Assessment of Functioning (GAF) assessment of 45 and 50 contained in the record," but did not give them "significant weight because" the GAF was intended for diagnostic purposes, not for determining disabilities.  (Admin. R. at 17.)  But the Court notes that the Eighth Circuit has endorsed the view that "an ALJ must consider a claimant's total GAF score history" and "consider or discuss a claimant's lowest scores."  Pate-Fires v. Astrue, 564 F.3d 935, 944 (8th Cir. 2009) (citing Colon v. Barnhart, 424 F. Supp. 2d 805, 813-14 (E.D. Pa. 2006)).

The ALJ further stated that GAF scores are only "a reflection of the claimant's functioning at one point in time and do not represent the claimant's functioning over an extended time period," noting that Claimant's "GAF was assessed at 52 in April 2008.  (Admin. R. at 17.) But that is precisely why an ALJ must consider a claimant's entire GAF score history.  And a single score of 52 neither precludes a physician's opinion that a claimant "was permanently disabled for any type of employment" nor constitutes "substantial evidence supporting the ALJ's

conclusion she is not disabled." Pate-Fires, 564 F.3d at 944 (addressing GAF score of 58).

Here, Claimant's GAF scores were as low as 30 on April 25, 2001, when Dr. Bork admitted her

to the hospital for "depression with anxiety" (Admin. R. at 442-43), and 35 on November 2,

2005, when Jane Anderson, MS, LP, conducted a diagnostic assessment of Claimant (id. at 367).

As the Eighth Circuit has summarized, courts have recognized that GAF scores of 50 or less

reflect "a serious limitation on a claimant's ability to perform basic life tasks" and often preclude

the ability to work. Pate-Fires, 564 F.3d at 944 (citations omitted).

Finally, the ALJ noted–in the course of discounting the opinion of Janet

Anderson–"claimant's lack of follow through in her medical treatment and her failure to take any

responsibility for her own actions." (Admin. R. at 22.)  He further noted the "references in the

record to the claimant's medication noncompliance." (Id. at 23.)  But as the Eighth Circuit has

explained, "federal courts have recognized a mentally ill person's noncompliance with

psychiatric medications can be, and usually is, the 'result of [the] mental impairment [itself] and,

therefore, neither willful nor without a justifiable excuse.'"  Pate-Fires, 564 F.3d at 945

(citations omitted).  "Courts considering whether a good reason supports a claimant's failure to

comply with prescribed treatment have recognized psychological and emotional difficulties may

deprive a claimant of 'the rationality to decide whether to continue treatment or medication.'"

Id.

Here, the ALJ did not assess whether any non-compliance was genuinely willful or

unjustifiable.  Moreover, there is substantial evidence of record that Claimant's memory

problems extended to her ability to maintain any prescription medication schedule.  (E.g.,

Admin. R. at 365 (noting that Claimant's "difficulty concentrating" and "short-term memory

problem" leads to "difficulty remembering when [s]he needs medications"), 518 (noting need for

Claimant to get a timer to signal daily medications).)[5]

And while drawing improper conclusions from his finding that Claimant failed to maintain her medications, the ALJ also stated that the opinions of the treating sources were "inconsistent with the overall evidence of record" in part because "the record reveals that the claimant has responded favorably to psychotherapy and psychotropic medications." (Id. at 23.) But "doing well for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to her work-related functional capacity." Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (stating that ALJ "erroneously relied too heavily on indications in the medical record that [claimant] was 'doing well'").

These numerous errors of law tainted the ALJ's evaluation of the evidence of record and of the weight to be given the medical opinions of the treating sources. The errors also undermined the hypothetical question he posed to the vocational expert. See infra § II.E.

### D.     Borderline Personality Disorder

Plaintiff also separately claims that the ALJ erred by failing to recognize her borderline personality disorder. (Doc. No. 12, at 25-27.) She contends that this "severe mental impairment . . . was diagnosed after the state agency review" on which the ALJ primarily relied. (Id. at 32.)

The state agency review to which the ALJ gave "greatest weight" was conducted in June 2006. On November 28, 2006, however, Jane Anderson, LP, conducted a Diagnostic Assessment Update that indicated an Axis II "current diagnosis" of "Borderline Personality

---

[5]     Accordingly, the ALJ improperly based his finding that "claimant's allegations of disability [are] less than credible" on her medication non-compliance. (Admin. R. at 23.) Nor can the ALJ premise any finding of Claimant's lack of credibility on the purported "inconsistencies" between her self-assessment of her ability to engage in certain functions and her claim of mental disability. Because the ALJ's credibility determinations were based on errors of law, the Court is not required to exercise its usual deference to the ALJ on such issues.

Disorder With Dependent Traits." (Admin. R. at 539.) After first noting Claimant's earlier February 2006 evaluation, and stating that Claimant "continues to meet the criteria for the above stated diagnoses," Anderson added that "[w]ith further exploration of Axis II criteria, it is evident at this point that [Claimant] does meet the criteria for Borderline Personality Disorder With Dependent Traits." (Id. at 539-40.) Anderson reiterated that diagnosis on February 19, 2008. (Id. at 653-54.) In April 2008, Susan Cook's Diagnostic Assessment also noted that Claimant "meets [the] criteria for Borderline [P]ersonality Disorder." (Id. at 664-68.) Cook reiterated that diagnostic assessment in March 29, 2009. (Id. at 823-24.)

The Commissioner suggests that this is merely harmless error, "[b]ecause the ALJ found severe impairments and proceeded through the analysis beyond step two." (Doc. No. 23 at 12.) But the Commissioner is required "to consider the combined effect of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient medical severity to be disabling." Cunningham v. Apfel, 222 F.3d 496, 501 (8th Cir. 2000). The Commissioner apparently agrees. (Doc. No. 23, at 12 ("The decisive issue is whether the ALJ properly considered all of Plaintiff's impairments in determining her capacity to work.") (emphasis in original).) But there is no evidence that the ALJ even considered Claimant's Borderline Personality Disorder. (Admin. R. at 15-16 (stating, after listing various impairments, that "[t]here are no other severe impairments documented in the record").)

Perhaps the ALJ did not mention Claimant's Borderline Personality Disorder because he discounted the opinions of the treating sources and relied primarily on the conclusions of the state agency consultants that preceded what appears to be the first formal diagnosis of that particular disorder. In any event, on remand, the ALJ must consider whether Borderline Personality Disorder is a severe impairment of Claimant, and if not, explain his decision. If it is

a severe impairment, he must consider it in the context of her other impairments when evaluating whether Claimant is disabled.

**E.      Deficient Hypothetical Question**

Plaintiff thus argues that the ALJ failed to include all of her severe impairments and limitations in the hypothetical question posed to the vocational expert, thereby rendering that expert's testimony incapable of being substantial evidence supporting a denial of benefits.  (Doc. No. 12, at 28-30.)  "It has long been the rule in this circuit that a hypothetical question posed to an ALJ must contain all of claimant's impairments that are supported by the record":

> Testimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical question.  When a hypothetical question does not encompass all relevant impairments, the vocational expert's testimony does not constitute substantial evidence.  Thus, the ALJ's hypothetical question must include those impairments that the ALJ finds are substantially supported by the record as a whole.

Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996).

Here, because there is no indication that the ALJ considered Claimant's Borderline Personality Disorder, the hypothetical question posed to the vocational expert would have failed to encompass any limitations posed by such an impairment.  Nor did the question capture the limitations posed by Claimant's well-documented–and essentially uncontroverted–reading problems.  (E.g., Admin. R. at 303-08 (noting that "prior testing . . . indicated an IQ of 76, as well as reading problems" and concluding that the WIAT-II data "are reflective of a woman with a specific learning disability in reading").)  The Commissioner argues that the question "adequately reflected Plaintiff's reading limitations" by asking the vocational expert to consider someone who could perform "low stress, routine, repetitive work with no detailed or complicated tasks."  (Doc. No. 23, at 22.)

The Court does not agree that any such limitation in the question reflects Claimant's

reading limitations adequately. As Mark Ham, Ph.D., L.P., concluded in his initial

psychological evaluation of her on February 6, 2006–a six-page report based not only on his own

current evaluation of Claimant but also on "the voluminous information already available in the

chart"–"[s]he is a woman with a <u>severe reading disorder</u>." (Admin. R. at 307 (emphasis

added).)[6] Finally, as Claimant notes, the three occupations that the vocational expert testified

someone with the ALJ's RFC would be able to perform all involve reasoning levels of 2 and

language levels of either 1 or 2, requiring reading skills that it has not been demonstrated

Claimant possesses. (Doc. No. 12, at 28-29.)

Because the ALJ erred by discounting the opinions of various treating sources and by

disregarding Claimant's Borderline Personality Disorder and the severity of her reading

problems, the hypothetical question posed to the vocational expert was improper and, therefore,

cannot constitute substantial evidence supporting the denial of benefits.

## F.     Duty to Fully and Fairly Develop the Record

Claimant also contends that the ALJ and Appeals Council failed to fulfill their duty to

develop the record in a fair and objective manner by not having the "record reviewed by a

psychiatric or psychological medical expert." (Doc. No. 12, at 32.) Furthermore, she contends

that such a referral should be made because the record suggests "that a finding that the listings

are met may be appropriate." (<u>Id.</u>)

As explained by the Social Security Administration,

---

[6]      The ALJ fails to explain how he concludes that this opinion is "vague and conclusory." (<u>Id.</u> at 22.) Ham's opinion was based in part on Claimant's scores on the WIAT-II tests, which he administered "to help determine whether or not she has a specific learning disability, particularly in the area of reading." (<u>Id.</u> at 306.) Claimant "obtained a standard score of 51 on Word Reading, 56 on Reading Comprehension, 64 on Pseudo Word Decoding, 81 on Numerical Operations, and 75 on Spelling." (<u>Id.</u>)

> in some instances, additional development required by a case–for example, to obtain more evidence or to clarify reported clinical signs or laboratory findings–may provide the requisite support for a treating source's medical opinion that at first appeared to be lacking or may reconcile what at first appeared to be an inconsistency between a treating source's medical opinion and the other substantial evidence in the case record.

Soc. Sec. Ruling 96-2P, 1996 WL 374188 (July 2, 1996). The ALJ "may need to consult a medical expert to gain more insight into what the clinical signs and laboratory findings signify in order to decide whether a medical opinion is well-supported or whether it is not inconsistent with other substantial evidence in the case record." Id.

As discussed above, the ALJ erred as a matter of law–on several issues–in the course of discounting the various medical opinions from treating sources in this matter. Although this Court's discussion of those errors should provide the ALJ on remand with an adequate framework in which to reassess those opinions and accord them the appropriate weight, the ALJ should consult a medical expert if he has any remaining doubts regarding those opinions.

## III.    CONCLUSION

After reviewing the entire record, the Court concludes that the combined effect of certain errors of law distorted the ALJ's assessment of the evidence in the record as a whole and undermined the propriety of the hypothetical question posed to the vocational expert. Accordingly, the decision denying benefits should be reversed and remanded for further proceedings consistent with this opinion.

## IV.    RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein, IT IS HEREBY RECOMMENDED that:

1.    Plaintiff's motion for summary judgment [Doc. No. 11] be **GRANTED IN**

**PART** (insofar as it seeks remand) and **DENIED IN PART** (insofar as it seeks reversal and an award of benefits);

     2.     Defendant's motion for summary judgment [Doc. No. 22] be **DENIED**; and

     3.     This action should be **REMANDED** for further proceedings consistent with this opinion.

Dated:  November 16, 2010

                                   _s/ Susan Richard Nelson_____
                                   SUSAN RICHARD NELSON
                                   United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by **December 1, 2010**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.